Raymond K. Dykema v. Commissioner. Estate of Albert W. Russel, Deceased, Catherine R. Peck, Central National Bank of Cleveland and Raymond K. Dykema, Executors v. Commissioner.
Raymond K. Dykema v. Commissioner
Docket Nos. 32512, 33880.
United States Tax Court
1953 Tax Ct. Memo LEXIS 276; 12 T.C.M. (CCH) 462; T.C.M. (RIA) 53147; April 28, 1953
Paul R. Trigg, Jr., Esq., 2746 Penobscot Building, Detroit, Mich., for the petitioners. Peter K. Nevitt, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: These cases, duly consolidated, involve deficiencies in income taxes as follows: In Docket No. 32512 for the calendar year 1946 in the amount of $734.77 and in Docket No. 33880 for the calendar year 1946 in the amount of $7,737.58. The important issue raised in the petitions is whether an attorney fee paid proportionately by Raymond K. Dykema and Albert W. Russel, deceased, in connection with a stock transaction is deductible as an ordinary and necessary expense paid for the production or collection of income under the provision of section 23 (a) (2), Internal Revenue Code *277 , or should be offset against the capital gain realized. One other issue raised by the petition in Docket No. 32512 has been abandoned by the petitioner. Other issues raised by the deficiency notices are not contested. The stipulation of facts filed by the parties is adopted by this reference. Findings of Fact Petitioner, Raymond K. Dykema, filed his income tax return for the taxable year 1946 with the collector of internal revenue for the district of Michigan at Detroit, Michigan. Albert W. Russel filed his income tax return for the taxable year 1946 with the collector of internal revenue for the 18th district of Ohio at Cleveland, Ohio. Albert W. Russel died on March 21, 1949. Catherine R. Peck, Raymond K. Dykema and the Central National Bank of Cleveland were named as executors of his estate in Albert W. Russel's last will and testament and they were duly qualified as such. In their capacity as executors they filed a petition for redetermination of the deficiency. Raymond K. Dykema, hereinafter referred to as Dykema, is an attorney at law and has practiced law in Detroit, Michigan, for many years. He is the senior partner in the law firm of Dykema, Jones and Wheat. Albert *278 W. Russel, hereinafter sometimes referred to as the decedent, had been a client of Dykema's for 25 years during which time a close association had developed between them. They had conferred about many of the decedent's affairs and investments and both were directors of a company in which the decedent had an important interest. Dykema and the decedent were not dealers in securities. In 1934, Dykema owned 300 shares of preferred "A" stock of McCord Manufacturing Company, hereinafter called Manufacturing, and the decedent owned 357 shares of preferred "A" stock and 657 shares of debenture stock in Manufacturing. The debenture stock was junior to the preferred "A" stock. At one time Manufacturing carried on extensive manufacturing activities, but prior to 1934 it had discontinued its manufacturing business and conveyed its plant and machinery to another corporation in exchange for a large block of common stock in that corporation. The corporation which acquired the assets of Manufacturing subsequently became the McCord Corporation, hereinafter referred to as McCord. From the time of the sale of Manufacturing's assets to McCord to the date Dykema and the decedent disposed of their Manufacturing *279 stock the assets of Manufacturing consisted almost entirely of the common stock of McCord. Manufacturing had four types of stock outstanding. They were: Preferred "A," Preferred, Debenture and Common. Preferred "A" was the senior stock in the capital structure and had a preferential position of $100 a share plus accumulated dividends of 7 per cent a year. At the date of the transaction here in issue the accumulated and unpaid dividends amounted to more than $105 per share. McCord owned 89.2 per cent of the preferred "A" stock of Manufacturing and by virtue thereof controlled that corporation. At the time Dykema and Russel determined to investigate the possibility of enforcing their rights as preferred stockholders, dividends on Manufacturing preferred "A" stock had been in default for 15 years because McCord common, which Manufacturing owned, was not paying dividends during that time. Dykema and the decedent knew that holders of Manufacturing preferred "A" stock were, by reason of the dividend default, entitled to elect a majority of the directors of Manufacturing, but they felt that this right was of no practical value to them because of the fact that McCord's continued control of *280 Manufacturing was assured by its ownership of 89.2 per cent of the preferred "A" stock. Petitioner Dykema and the decedent believed the preferred "A" and debenture stock of Manufacturing held by them was not marketable. On the other hand, they knew the common stock of McCord to be readily salable. In view of these circumstances, Dykema and Russel on or about September 22, 1944, retained the law firm of Dykema, Jones and Wheat to make an investigation of their rights as holders of the two classes of Manufacturing stock held by them and to advise petitioners with respect to the proper strategy to effectuate a transfer of their Manufacturing stock for common stock of McCord. At the time the mentioned law firm was retained, Dykema and Russel felt their interest in Manufacturing was so small in comparison to the holdings of McCord therein that they as investors occupied an extremely disadvantageous position with respect to their ability to enforce payment of their dividend rights as preferred "A" stockholders. Upon investigation and research, the attorney determined and advised Dykema and Russel that the then and prospective earning power of McCord was insufficient to produce dividends *281 on its common stock adequate to pay past and future dividends on Manufacturing preferred "A"; that the proper strategy to be adopted by their clients was to prepare for and threaten a suit to dissolve Manufacturing either through the office of the Attorney General of the State of New York or in default of action on the part of the Attorney General at the instance of these petitioners. Dykema believed that a New York suit brought to dissolve Manufacturing would meet with strong resistance from McCord and corporations affiliated therewith; that protracted and expensive litigation would result; that the chances of reaching an amicable settlement of a dissolution suit were slight because of the personal animosity toward Russel on the part of an important person in one of the McCord affiliates. Dissolution of Manufacturing would have resulted in the distribution of its assets, which consisted of McCord stock, or the sale of its assets and distribution of the resulting cash, or partly one and partly the other. Formal notice was served upon Manufacturing that Dykema and Russel intended to seek dissolution of that company. In the fall of 1945 there were discussions between counsel for Manufacturing *282 and for Dykema and the decedent upon the question of settlement. A proposal of settlement was then made and was afterwards withdrawn. After the offer was withdrawn preparation for litigation continued on the part of Dykema and the decedent. On March 8, 1946, negotiations were again resumed from which a settlement offer resulted. Manufacturing offered Dykema and the decedent 4,000 shares of the McCord common stock in its treasury in exchange for all of Dykema's and the decedent's Manufacturing stock of both classes. Dykema and the decedent accepted this offer on March 18, 1946. No law suit to force dissolution of Manufacturing was filed on behalf of Dykema and the decedent. Dykema and the decedent divided the 4,000 shares of McCord common according to their holdings in Manufacturing. Dykema received 1,526 shares and the decedent received 2,474 shares. For each share of Manufacturing preferred "A" stock Dykema and the decedent owned they received 5.1 shares of McCord common stock. For each share of debenture stock held by Russel he received in exchange approximately one share of McCord common. It is stipulated that prior to the settlement each share of preferred "A" stock of Manufacturing *283 was represented by 7.1 shares of the McCord common owned by Manufacturing. The adjusted basis of Dykema's and the decedent's Manufacturing stock, the fair market value of McCord stock they received in exchange, and the gain on the exchange realized by each were as follows: Fair
Manufac-
Market
turing
Value of
Gain
Stock
McCord
on the
Basis
Stock
Exchange
Dykema
$ 450.00
$29,375.50
$28,925.50
Russel
16,716.55
47,624.50
30,907.95
On April 1, 1946, the attorneys billed Dykema and the decedent for legal services covering the entire transaction in the amount of $5,400 plus $5.25 for telegrams and long distance tolls. Dykema and the decedent paid the attorney fee during the taxable year. In their 1946 income tax returns, Dykema and the decedent deducted from gross income the amount of the respective attorney fee paid by each. In each instance the deduction was taken as a non-business expense by virtue of section 23 (a) (2), Internal Revenue Code. Respondent disallowed the amounts as deductions but allowed them as an offset in computing the capital gain realized. The attorney fee was incurred and paid in *284 the disposition or exchange of property. Petitioners' Manufacturing stock was disposed of by way of an exchange of capital assets. Petitioner Dykema listed the following deduction from gross income on his income tax return for 1946: "Revenue stamps $8.86." This issue was raised by Dykema in his petition but he did not present any evidence relating to the deduction at the trial. Therefore, it appears that Dykema abandoned the issue. Decision on this issue is for the respondent. Opinion Dykema and Russel are hereinafter sometimes referred to as petitioners. The fact that Russel is deceased does not bear upon our decision. This case involves the sole question of deductibility from gross income of an attorney fee, the reasonableness of which is not in controversy. Petitioners base their case upon the following alternative theories: (a) That our decision as to the character of the attorney fee here sought to be deducted from gross income should be governed by the fact that the exchange of Manufacturing stock for the common stock of McCord was in reality a collection of the accrued and unpaid guaranteed dividends on petitioners' preferred "A" Manufacturing stock, thus bringing the *285 case within section 23 (a) (2), Internal Revenue Code, [1] as involving the production and collection of income; (b) that the attorney fee was incurred and paid in the management and conservation of petitioners' rights as preferred "A" stockholders; (c) that in any event at least that portion of the attorney fee attributable to investigation, research and advice is deductible from gross income because it was incurred and paid for management of petitioners' rights as preferred "A" stockholders, in that they would have been unable to determine upon a course of action or strategy with respect to such rights without first obtaining the advice resulting from the attorney's investigation and research. Under this latter theory, we understand that petitioners admit the propriety of the deficiency with respect to that portion of the attorney fee attributable directly to the negotiations which resulted in the final exchange of their Manufacturing stock for that of McCord. *286 We have carefully considered petitioners' three alternative theories and are unable to agree therewith. Here, there was no property held for the production of income within the meaning of section 23 (a) (2). On the contrary, it is clear that a disposition of property was the prime objective of petitioners at all times pertinent hereto. Petitioners were experienced businessmen. Russel had been in business at least 25 years during a portion of which time he was a corporate director, and Dykema had practiced law for at least 25 years during which time he acted as legal adviser to Russel and was during a portion of said time himself a corporate director. We are convinced that prior to retaining the law firm of Dykema, Jones and Wheat both petitioners realized they occupied a position as minority stockholders of Manufacturing from which they must extricate themselves in order to recover funds invested in that corporation's stock; that Manufacturing, having refused to pay its guaranteed dividends for fifteen years, in all probability would continue to refuse to do so in the future so long as petitioners continued to hold their preferred "A" stock; that their Manufacturing stock was, *287 as a practical proposition, non-marketable but that McCord common stock was marketable; that, generally speaking, they were of the opinion their only avenue of escape from the dilemma was by way of a suit to dissolve Manufacturing, the foreseeable results of such a suit, if successful, being that they would thereby acquire their proportionate share of the McCord common stock held in the treasury of Manufacturing or that they would receive their proportionate share of the proceeds of a dissolution sale of that stock or partly one and partly the other. We are convinced, too, that petitioners realized that the mere threat of a dissolution suit would in all probability open the door to settlement negotiations with Manufacturing and McCord. It is obvious that men as experienced as petitioners would not embark upon such a course of action however without first fortifying themselves with legal counsel, but we believe they had formed their determination to seek an ultimate exchange of Manufacturing stock for that of McCord before they did so. We are strengthened in our belief by the bill for services rendered by the attorneys. Dykema was the senior member of the firm which rendered the services *288 and presented the bill and it may reasonably be concluded that he approved the bill as presented. The statement of the attorneys, Dykema, Jones and Wheat, is as follows: "Albert W. Russel and Raymond K. Dykema" "In account with DYKEMA, JONES & WHEAT, 2746 Penobscot Building, Detroit 26" "RKD:de" "April 1, 1946" "For professional services rendered September 22, 1944 to date in connection with the effort to effect convers&on of &nvestments in McCord Manufacturing Company, Inc. into common stock of McCord Corporation in order to substitute for securities with poor dividend prospects stock with established earning power and good dividend prospects. The services included: "Study of the corporate history of the various corporations now or formerly active in the McCord enterprises - McCord Manufacturing Company, Inc., McCord Corporation, and two other corporations. "Study of the financial situation of the two principal corporations. "Examination of statutes of New York and cases decided in the New York courts in order to form an opinion as to whether dissolution of McCord Manufacturing Company, Inc. could be forced through court proceeding conducted either through the Attorney-General *289 of New York or independently. Similar examination of authorities in other jurisdictions as to the right to compel dissolution on general grounds and independently of statutes. "Preparation and submission to McCord interests of memorandum brief containing analysis of facts relevant to contest over dissolution and discussion of applicable law. "Review of legal authorities on question of whether petitioners or defendant corporation would bear expenses of involuntary dissolution proceeding if the same were successful. "Preparation and submission to directors of McCord Manufacturing Company, Inc. a memorandum discussing relevant facts and legal principles and demanding that the corporation proceed with voluntary dissolution. "Many conferences with counsel for McCord interests and others, correspondence, etc. - the whole effort resulting in exchange of securities in McCord Manufacturing for 4,000 shares of McCord Corporation Common stock: $5,400.00 "Disbursements: "Telegrams and long distance
tolls:
5.25
Total:
$5,405.25
"Amount payable by each client in proportion to number of shares received by each: "A. W. Russel
$3,343.15
R. K. Dykema
2,062.10
$5,405.25"
*290 The conclusion that petitioners retained their attorneys for the sole purpose of effecting a disposition of their Manufacturing stock either by way of a dissolution suit or through a negotiated exchange of that stock for McCord common is inescapable. In either eventuality, petitioners' purpose with respect to their Manufacturing stock was to divest themselves of property held for the production of income, not to hold it. Section 23 (a) (2) deals with property held for the production of income, not with property which may produce income only by its sale, exchange or other disposition. The acquisition of title to McCord stock was the prime objective of petitioners in hiring their attorneys. This fact alone precludes application of section 23 (a) (2) to the attorney fee here involved with the exception hereinafter noted. Agnes Pyne Coke, 17 T.C. 403, affirmed 201 Fed. (2d) 742 (C.A. 5, January 19, 1953). Petitioners rely heavily upon Agnes Pyne Coke, supra. In that case the attorney was hired for two distinct purposes: (a) To recover property and (b) to collect income due the petitioner in the settlement of her divorce suit. We held that the portion *291 of the attorney fee attributable to category (a) was subject to capital treatment, and that the portion thereof attributable to category (b) was properly deductible from gross income. The distinguishing feature between the Coke case and the case at bar lies in the purpose for which the attorney was hired. There, one of the original objectives was clearly the collection of income while the hiring of the attorneys in the instant case was clearly for the purpose of disposition or exchange of a capital asset. Petitioners in urging, as controlling of the issue, the fact that they realized income by way of a capital gain on the exchange of stock become guilty of the error of which they accuse the respondent, i.e., approaching the problem from the standpoint of results rather than that of purpose. So approached, the administration of section 23 (a) (2) presents virtually an insurmountable difficulty which we are certain Congress had no intention of creating by its enactment of that section. From the standpoint of the taxpayer, it might, in many instance, on that theory become impossible to deduct an otherwise deductible attorney fee in the year in which it was paid and incurred. From the *292 standpoint of the taxing power, it would, in many instances, prevent a yearly accounting which is required by the Internal Revenue Code. Burnet v. Sanford & Brooks Co., 282 U.S. 359. Deductibility of an item of expense under section 23 (a) (2) must be determined, not by the results of the expenditure, but by the underlying purpose thereof. In H. C. Naylor, 17 T.C. 959, reversed on factual grounds, 203 Fed. (2d) 346 (C.A. 5, April 3, 1953), we held not deductible from gross income an amount representing an attorney fee incurred and paid in connection with a controversy involving collection of the sales price of stock. We found as a fact that the services of the attorney related directly to a sale of stock and that the main efforts of the attorney were directed toward the obtaining of a greater sale price than had been offered. Our basis for decision was that an attorney fee incurred for the collection of income through a sale of property held to produce income was excepted from and not within the ambit of section 23 (a) (2). In reversing, the U.S. Court of Appeals for the Fifth Judicial Circuit did not disturb our basis for decision but founded *293 its decision upon a finding of fact to the effect that the sale of stock had already taken place when the attorney was hired and that his services related not to the amount theretofore offered for the stock by the purchaser but only to the difference between that amount and the sum finally recovered by the taxpayer. As we view the decision it is by corollary at least a substantiation of our holding in the instant case. Contrary to the express terms of the statement of the law firm here involved, we are satisfied that at least a portion of their services took the form of research and advice relating solely to petitioners' rights arising from their status as preferred stockholders. As to that portion of the fee attributable to such services, we conclude the same to be deductible from gross income as such services, although having a bearing upon petitioners' ultimate decision to dispose of their Manufacturing stock, clearly bore a close relationship to the management of the Manufacturing stock which was held by them for the production of income. Walter S. Heller, 2 T.C. 371. We are at a loss, however, to determine any amount of the attorney fee attributable to that portion *294 of the attorneys' services for the reason that the record is silent with respect thereto. We therefore hold that the entire amount of the attorney fee incurred and paid by petitioners is deductible only as an addition to the cost basis of their Manufacturing stock. Petitioner Dykema deducted from his gross income, "Revenue stamps $8.86." The Commissioner disallowed the deduction. No evidence was submitted by petitioner to show error on the part of the Commissioner. The Commissioner's determination is deemed to be correct. Brown v. Commissioner, 22 Fed. (2d) 797. Decisions will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - * * *
(2) Non-trade or non-business expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.↩